Matter of Angelica CC. v Ronald DD. (2023 NY Slip Op 05291)

Matter of Angelica CC. v Ronald DD.

2023 NY Slip Op 05291

Decided on October 19, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:October 19, 2023

533921
[*1]In the Matter of Angelica CC., Respondent,
v
Ronald DD., Appellant. (And Two Other Related Proceedings.)

Calendar Date:September 6, 2023

Before:Clark, J.P., Aarons, Reynolds Fitzgerald, Ceresia and Fisher, JJ.

Theresa M. Suozzi, Saratoga Springs, for appellant.
Gordon, Tepper & DeCoursey, LLP, Glenville (Jennifer Powers Rutkey of counsel), for respondent.
Veronica Reed, Schenectady, attorney for the child.

Fisher, J.
Appeal from an order of the Family Court of Schenectady County (Jill S. Polk, J.), entered June 25, 2021, which, among other things, granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, to hold respondent in willful violation of a prior order of custody.
Petitioner (hereinafter the mother) and respondent (hereinafter the father) are the unmarried parents of a child (born in 2016). The underlying facts of this case are familiar to this Court, as we previously affirmed orders granting the mother's prior violation petitions and awarding her counsel fees (214 AD3d 1091 [3d Dept 2023], lv denied 39 NY3d 915 [2023]). As relevant here, the parties entered into an order of custody on consent in March 2017 (hereinafter the 2017 order), granting them joint legal and shared physical custody of the child with a schedule specifying times for exchanges. In mid-March 2020, as a result of the COVID-19 pandemic,[FN1] the parties agreed to modify this schedule to allow the father to care for the child every weekday morning, thereby removing the need for the child to attend daycare and potentially be exposed to COVID-19. Thereafter, the father became increasingly concerned about COVID-19 and accused the mother of failing to take adequate safety precautions for the child. As a result, exchanges became increasingly strained and the mother sought to return to the original visitation schedule; the father refused and informed the mother that he was keeping the child indefinitely.
Consequently, the mother filed a petition seeking to enforce the 2017 order requiring the father to turn the child over to her as scheduled, and the father filed a modification petition seeking to be awarded sole legal custody of the child due to the mother's purported inability to care for the child in light of the danger posed by COVID-19. Following an emergency hearing on both petitions, Family Court issued a temporary order (hereinafter the April 2020 order) which, among other things, reduced the father's visitation to one daily phone call for five minutes in length, and forbid him from disparaging the mother or from speaking to the child about a number of issues related to visitation, custody and COVID-19. Pursuant to an order on consent entered in September 2020 (hereinafter the September 2020 order), the parties agreed to amend the April 2020 order to allow the father two hours of visitation per week, supervised by the mother.
In February 2021, as the result of the father's continued conduct, the mother filed a petition seeking to hold the father in contempt of the 2017 order and the April 2020 order. Following a fact-finding hearing, Family Court found the father in contempt of both orders, as he failed to return the child at an exchange and made multiple statements prohibited by the April 2020 order on several occasions during telephone calls and his supervised visitation. The court also found that a change in circumstances had occurred and that it was in [*2]the child's best interests for the mother to retain sole legal and primary physical custody of the child, and for the father's visitation to be limited to an hour of visitation supervised by a psychologist. The father appeals.
We affirm. In order to prevail on a violation petition, a proponent "must establish, by clear and convincing evidence, that there was a lawful court order in effect with a clear and unequivocal mandate, that the person who allegedly violated the order had actual knowledge of the order's terms, that the alleged violator's actions or failure to act defeated, impaired, impeded or prejudiced a right of the proponent and that the alleged violation was willful" (Matter of Carl KK. v Michelle JJ., 175 AD3d 1627, 1628 [3d Dept 2019]; accord Matter of Timothy RR. v Peggy SS., 206 AD3d 1123, 1124 [3d Dept 2022]). Here, the father admitted that he violated both orders, which he had previously read and understood. As to the 2017 order, the record demonstrates that the father refused to bring the child to a scheduled exchange, even telling the mother to file an emergency petition, and that he continued to refuse until law enforcement became involved. Such conduct impaired the mother's rights, as she lost two days of scheduled time with the child. Although the father framed his refusal to return the child to the mother under the guise of protecting the child from COVID-19, the record indicates that the mother had already agreed that she would not return the child to daycare, which was the basis of the father's concern, therefore removing his rationale for withholding the child from the mother (compare Matter of Jennie BB. v Anne CC., 210 AD3d 1337, 1338 [3d Dept 2022]; Matter of Nelson UU. v Carmen VV., 202 AD3d 1414, 1416 [3d Dept 2022]). Relating to the April 2020 order, the record reveals that the father repeatedly engaged in conduct prohibited by the order for approximately 11 months — including during a recorded video call when he made numerous prohibited statements to the child and engaged in several prohibited acts in front of the child while the mother repeatedly asked him to stop. The record further demonstrates that the father's conduct had a clear effect on the child, causing the child to become upset and cry on several occasions; furthermore, the father admitted that his conduct was not appropriate, was wrong and that it was prohibited by the order but he continued to do it.[FN2] To this end, the attorney for the child contends that the father's conduct amounts to clear and convincing evidence in the record to support the court's finding of contempt. Upon our review, where we defer to Family Court's credibility assessments and factual findings, we find that the court did not abuse its discretion in finding that the father violated the 2017 order and the April 2020 order and that such violations were willful (see Matter of Timothy RR. v Peggy SS., 206 AD3d at 1125-1126; see also Matter of Angelica CC. v Ronald DD., 214 AD3d at 1093[*3]).
Next, we turn to Family Court's determination modifying the custody arrangement and limiting the father's visitation to be supervised by a psychologist. In light of our determination on the violation petition and from our review of the record — which reveals the father's increasingly hostile demeanor toward the mother, repeated messages and accusations against her, as well as his unwelcomed romantic advances and threats to call the police to conduct a wellness check on her — the requisite change in circumstances had occurred since the prior orders were entered warranting an inquiry into the best interests of the child (see Matter of Derek KK. v Jennifer KK., 196 AD3d 765, 767 [3d Dept 2021]; see also Matter of Angelica CC. v Ronald DD., 214 AD3d at 1093-1094). Turning to this inquiry, the best interests of the child are presumed to lie in a healthy relationship with the noncustodial parent (see Matter of Michael NN. v Robert OO., 210 AD3d 1326, 1327 [3d Dept 2022], lv denied 39 NY3d 910 [2023]), and such "presumption may be overcome only where the party opposing visitation sets forth compelling reasons and substantial evidence that such visitation would be detrimental or harmful to the child's welfare" (Matter of William V. v Christine W., 206 AD3d 1478, 1481 [3d Dept 2022] [internal quotation marks and citations omitted]; see Matter of Brandon HH. v Megan GG., 214 AD3d 1036, 1037 [3d Dept 2023]). The relevant factors in a best interests analysis include "the quality of the parents' respective home environments, the need for stability in the child's life, each parent's willingness to promote a positive relationship between the child and the other parent and each parent's past performance, relative fitness and ability to provide for the child's intellectual and emotional development and overall well-being" (Matter of Joshua PP. v Danielle PP., 205 AD3d 1153, 1155 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 901 [2022]). "The court's ultimate assessment of the child's best interests is to be accorded great deference so long as it is supported by a sound and substantial basis in the record" (Matter of David VV. v Alison YY., 203 AD3d 1534, 1535 [3d Dept 2022] [citation omitted], lv denied 38 NY3d 908 [2022]; see Matter of Derek KK. v Jennifer KK., 196 AD3d at 767).
Here, Family Court's order awarding the mother sole legal and primary physical custody of the child, with supervised visitation to the father, is supported by a sound and substantial basis in the record. During the fact-finding hearing, the mother testified that, shortly after the parties agreed to let the father take the child in the mornings instead of sending the child to daycare, the father's conduct began to spiral into a troubling pattern. She testified that the father began to make repeated romantic overtures toward her, including an attempt to give her an engagement ring in front of the child. As a result of the mother's refusal, the father [*4]accused her of "trying to kill him" and threatened to call the police for a wellness check on her. Thereafter, the father began sending the mother news stories and information about COVID-19, accusing her of failing to enforce social distancing and masking protocols on the child, a point she denied. Such conduct was particularly exacerbated around custody exchanges, where the father was routinely late and would obsessively forward various COVID-19 news or safety information to the mother — even conditioning the return of the child upon her promise to follow such safety guidelines. Such conduct ultimately led to the circumstances of the violation petition relating to the 2017 order, wherein the father refused to exchange the child until the police were summoned.
The record further contains several incidents that demonstrate an acrimonious decline in the parties' interactions, spurred by the father, which were to the detriment of the child. This includes an exchange where the father began yelling at the mother over the child's alleged lack of eating, which precipitated into the father telling the child to call the mother "mean"; the mother later testified that the child reported having nightmares over this exchange. During telephone calls with the father, the testimony and video-recorded evidence demonstrated that the father would cry to the child, tell the child he missed him and that no one would keep them apart. The father had also encouraged the child to chant "longer, longer, longer" in an effort to coerce the mother to extend the father's contact with the child, and further created a codeword for the child to say when someone was trying to keep the child away from the father. During supervised visits pursuant to the September 2020 order on consent, the father brought a picture of himself for the child to put on the mother's wall, and he would excessively hug the child while repeatedly telling the child that he loved him. On one occasion, the father insisted that the child only lie down on the couch with him, repeatedly hugged the child and did not let the child play with toys that the father had brought for the visit. At another supervised visit, the father pulled off the child's pants while they were playing, upsetting the child, and then he insisted on consoling the child, taking the child away from the mother and then pretending to leave in order to get the child to stop crying.
Based on the foregoing, Family Court duly exercised its discretion in awarding sole legal and primary physical custody to the mother. Although Family Court heard some positive aspects of the father's behavior improving through two online parenting classes, as well as his participation in counseling and through a separate program,[FN3] the record still contains repeated and concerning conduct by the father that dominates the interactions between the parties and the child. This conduct has continued to escalate and has become more detrimental to the child, a point that [*5]the father acknowledges but affirmatively disregards as he willingly violates multiple orders of Family Court. To that end, these behaviors constitute compelling reasons to deny unsupervised visitation to the father, despite the presumption otherwise, as they indicate that continued visitation would otherwise be detrimental to the child's welfare (see Matter of Brandon HH. v Megan GG., 214 AD3d at 1039; Matter of William Z. v Kimberly Z., 212 AD3d 1036, 1039 [3d Dept 2023]; Matter of Ajmal I. v LaToya J., 209 AD3d 1161, 1164 [3d Dept 2022]; see also Matter of Angelica CC. v Ronald DD., 214 AD3d at 1094). Accordingly, we find that a sound and substantial basis exists in the record to support Family Court's custody modification and to deny the father unsupervised visitation (see Matter of Angelica CC. v Ronald DD., 214 AD3d at 1094; Matter of Derek KK. v Jennifer KK., 196 AD3d at 768; see also Matter of Christopher WW. v Avonna XX., 202 AD3d 1425, 1426 [3d Dept 2022]; Matter of Carin R. v Seth R., 196 AD3d 776, 778 [3d Dept 2021]). We have examined the remaining contentions of the parties and have found them to be without merit or academic.
Clark, J.P., Aarons, Reynolds Fitzgerald and Ceresia, JJ., concur.
ORDERED that the order is affirmed, without costs.

Footnotes

Footnote 1: The pandemic caused by the novel coronavirus known as COVID-19 became prevalent in the United States and particularly New York in mid-March 2020, which is generally considered the start of the pandemic in this country.

Footnote 2: The father testified that, as time went on after the April 2020 order was issued, it "didn't seem like it was possible" or "realistic" for him to comply with its terms.

Footnote 3: There was testimony from a counselor working with the father, who had never met with the father and the child together, or the child alone, and who only spoke to the father about the facts of the case. She had not had a client in approximately three years and had been referred to the father by the father's mother — who was a coworker at one time. She also did not render any diagnosis of the father or perform any mental health tests on him. Family Court afforded her testimony limited weight.